Filed 2/15/24  In re N.C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> N.C., <br><br> Defendant and Appellant; <br><br> Q.P., <br><br> Respondent. | D082540 <br><br> (Super. Ct. No. J521212) |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent

Jesse McGowan, under appointment by the Court of Appeal, for Respondent.

N.C. (Mother) appeals from the August 1, 2023 juvenile court order sustaining the San Diego County Health and Human Services Agency (Agency) petition and placing N.C. (Child) with Q.P. (Father).[1] She asserts that the court erred first, when it asserted jurisdiction over Child and second, when it found by clear and convincing evidence that removing Child from Mother's care and custody was necessary for Child's protection. We disagree.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has a years-long history of mental health diagnoses. Mother disclosed that she was diagnosed with posttraumatic stress disorder (PTSD) in 2020 and maintains she was not prescribed medication to manage her condition. She acknowledges her history of anxiety and depression and admits to stopping her medication. Her family observed that Mother struggled with her mental health for years, beginning during her adolescence. Mother asserts her behavioral issues as a teen were "due to traumatic experiences and abuse from different people."

Mother and Father ended their relationship before Child was born; they do not reside together and are no longer romantically involved. Their relationship is marked with incidents of domestic violence in which Mother is the aggressor. Prior to the events that gave rise to this matter, Mother suffered a DUI related charge and conviction in June 2020. Later, Mother

---

[1] Father filed a respondent's brief in this matter.

was convicted of battery of an intimate partner and resisting an executive officer related to an incident that occurred while she was 3-4 months pregnant with Child, in June 2021. As a result of this incident, the court ordered Mother to participate in a domestic violence recovery program for aggressors. Other interactions, while not violent, give Father cause for concern. While Father was out of town in December 2021, Mother texted Father to falsely report the death of Child. She then denied sending any such text.

## A. 2022 Referral to Child Welfare Services

In early January 2022, Mother was again arrested for battery of an intimate partner and was ultimately convicted. Subsequently, Father filed for a domestic violence restraining order (DVRO), and received a criminal protective order. Also in January, Mother attempted suicide by intentionally crashing her vehicle into a pole. Mother had been drinking prior to the attempted suicide and sustained another DUI charge and conviction; Child was with the maternal grandparents during this incident. As a result of this second DUI, Mother's license was suspended, and she was ordered to participate in DUI and anger management classes. Nevertheless, Mother admits she still consumes alcohol, but asserts she "stay[s] away from hard liquor" and is "not drunk with [Child]."

After her suicide attempt, Mother called the Child Abuse Hotline and made a referral for Child. During the referral, Mother disclosed she suffered from depression. Mother did not participate in the investigation but shared that she was in the Navy and trying to end her contract because she did not have childcare. Ultimately, the 2022 referral was closed as inconclusive.

Mother contends that Father, the protected party, "keeps violating the Criminal Protective Order."

3

### B. 2023 Referral to Child Welfare Services

The Navy discharged Mother in February 2023. This development worried the maternal grandmother because "[Mother] had childcare on base" and because Mother "did not have a plan." Mother and Child went to stay with the maternal grandparents on March 16, 2023. Mother was "convinced that 'somebody was after her.'" Mother reported that she was not sleeping, felt scared and paranoid, and was having panic attacks. She was afraid to be alone with Child.

Mother stated that the marijuana joint she received from her boyfriend may have been laced with something. In contrast, Mother indicated to her domestic violence program leader that someone put something in her drink. Mother recently "lost a lot of weight," and denied the weight loss was a result of drug use.

On March 21, Mother called a former coworker and asked him for a ride from a local restaurant. When he arrived, Mother rushed into the car, stating the maternal grandparents were chasing her and Child and had a plot to kill them. She believed the maternal grandparents were after her "because she has military benefits" and that "they are trying to gaslight her." The former coworker drove Mother and Child to a sheriff's station. There is nothing to indicate whether Child was seated in a child's seat appropriate for her age during this ride. Mother maintains her former coworker forced her to the sheriff's station under threat with a firearm. The coworker did not know why Mother called him for assistance, and explained that he does not regularly spend time with either Mother or Child. He also stated Mother asked him to drive her to a police station. He did not anticipate another psychotic episode happening but does not plan to talk to Mother again.

4

At the sheriff's station, Mother exhibited signs of "excited delirium" consistent with consumption of methamphetamine. Sheriff's deputies grew concerned Mother might drop Child while she moved around and removed Child before subduing Mother. Neither Mother nor Child sustained injuries during the encounter, though mother asserts law enforcement "beat her up." Child was admitted into Polinsky Children's Center and Mother stayed in-hospital on a psychiatric hold until March 27. Hospital staff described Mother as "violent," "verbally and physically erratic," and a "potential threat[ ] to others." Mother required medication because she became "increasingly anxious" and "more explosive." During her hospitalization, Mother reported "a history of psychiatric issues." She believed she was " 'not gonna make it to [her] birthday.' "

Mother believes " 'the incident is crazy' " because she was trying to protect Child from the maternal grandparents. She believes the maternal grandparents " 'are sick and doing something weird.' " She " 'genuinely did not mean to put [Child] in danger,' " and maintains she is able to recognize within herself any signs of a mental breakdown.

In a virtual Child and Family Team Meeting with the Agency in April, Mother became upset. Both she and her boyfriend left the meeting early. This boyfriend is the same person who provided Mother with a potentially laced marijuana joint.

The Agency cannot ensure Child's safety if Child is placed with Mother. They believe Child needs a "safe environment with structure and stability" and worry that, in Mother's care, Child risks "being placed in dangerous situations where her physical or emotional wellbeing is neglected and/or harmed based on [Mother's] untreated mental health." They assert that

Mother's "delusional episode" and "paranoia" contribute to their concerns for Child's safety.

## C. Mental Health Resources and Referrals from the Agency

The treating hospital forwarded Mother's information to Crownview Medical Group upon her discharge from the psychiatric hold. It is unclear whether Mother has sought continued service from Crownview Medical Group. The Agency referred Mother to community resources and Mother indicated she had a therapy appointment scheduled for April 3, 2023; she did not attend her appointment. After attending a different appointment on April 10, 2023 with a virtual therapist, Mother reported that they did not agree with a diagnosis of schizophrenia and that they declined to provide her with additional care. Further, Mother claims that the therapist did not refer her to alternate services. The Agency referred Mother to South Bay Guidance Center; Mother claims South Bay Guidance Center does not accept health insurance from the VA. Healthcare workers stated Mother is on maternal grandmother's health insurance, not insurance from the VA. The Agency referred Mother to Chula Vista Vet Center, Community Services for Families, and Jewish Family Services. Mother declined the Parent Partner support from Jewish Family Services. Later, the Agency referred Mother to Community Services for Families and Visitation Coaching; Mother again declined the service.

Following the March 2023 incident, Mother denied receiving in-patient mental health treatment and says, instead, that she went to the hospital for an injury. A month after the psychotic episode, Mother maintained that maternal grandparents were a threat to herself and Child, that her former coworker had a firearm, and that she did not experience a mental health emergency. Two months after the psychotic episode, Mother still denied her

6

psychological history and became agitated discussing referrals. Three months after the episode, Mother continued to deny having any mental health concerns. Mother's "lack of insight" remains a concern for the Agency. A conclusive diagnosis for the cause of the psychosis was not included in the record.

## D. *Procedural History*

The Agency filed a petition on behalf of one-and-a-half-year-old Child under Welfare and Institutions Code section 300, subdivision (b).[2] Child was at substantial risk of "serious physical harm, or illness" due to Mother's "mental illness, developmental disability or substance abuse."

At the detention hearing on April 18, 2023, the court ordered Child detained with Father. The court found detention necessary because "there are no reasonable means by which [Child's] physical and emotional health may be protected without removing [Child] from [Mother's] physical custody." At the contested adjudication/disposition hearing on August 1, 2023, the court sustained the Agency's petition and ordered Child placed with Father. The court exercised jurisdiction because of "the severity of the incident and the other indicia of mental health issues," concluding "that without court intervention there is substantial risk that [Child] will suffer serious harm or injury." Mother appeals.

On appeal, Mother argues that she poses no current risk to Child and that neither jurisdiction nor removal are appropriate. Mother disavows any negative impact on Child from her domestic violence with Father, DUIs, suicide attempt, or psychotic episode. She observes that Child was present for neither the domestic violence incidents nor her drunken suicide attempt.

---

2      All subsequent statutory references are to the Welfare and Institutions Code unless otherwise stated.

Mother argues that the court had no evidence to conclude she presented a future harm to Child. Further, she asserts her March 2023 mental health crisis was a "one-time occurrence." Mother claims her last substance use incident was the DUI and resultant suicide attempt in January 2022, but admits "[s]he smoked marijuana and had a bad reaction to it."

DISCUSSION

Section 300, subdivision (b) allows dependency when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness" because the parent has failed or is unable to provide adequate supervision or protection. (§ 300, subd. (b).) Section 361, subdivision (c)(1) permits removal when the court finds there is clear and convincing evidence that there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child without removing the child. (§ 361, subd. (c)(1).) The parent need not be dangerous, and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136 (*T.V.*).)

We review the court's jurisdictional findings under section 300, subdivision (b)(1) for substantial evidence. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) Child need not be *actually* harmed for the court to assume jurisdiction. (See *In re James R.* (2009) 176 Cal.App.4th 129, 135.) Similarly, we review a dispositional removal order on appeal for substantial evidence. (*In re R.V.* (2012) 208 Cal.App.4th 837, 849.) "The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home." (*T.V., supra*, 217 Cal.App.4th at p. 135.) In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may

8

consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to the juvenile court intervention. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) The juvenile court also considers whether there are reasonable protective measures and services that can be implemented to prevent the child's removal from the parent's physical custody. (§ 361, subd. (c)(1); see §§ 202, subd. (a), 16500.5, 16501, 16501.1.)

" 'In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.' [Citation.] ' "If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed . . . ." ' [Citations.]" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) "Thus, we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw." (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.) The court may consider Mother's past conduct and current situation and gauge whether she has progressed sufficiently to eliminate any risks. (See *In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

In the juvenile court, the Agency had the burden of proof by a preponderance of the evidence. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.) Mother now has the burden of showing the jurisdictional finding is unsupported by substantial evidence. Viewed in the light most favorable to

9

the court's jurisdictional and dispositional orders, we conclude Mother has not met her burden.

Mother's bare assertion that the court did not have sufficient evidence to assert jurisdiction or to remove Child from her care does not negate the evidence contained in the record. The record is clear that Mother struggled and continues to struggle with her untreated mental health and violent tendencies. Accordingly, there is ample evidence to support the juvenile court's orders and we must find in favor of the orders.

The evidence clearly demonstrates that Mother neither recognizes nor acknowledges her mental health and possible substance use issues. In the months since her mental health crisis, she consistently refused to acknowledge what happened and declined support and assistance from the Agency's referrals. She claimed at different points that her boyfriend laced her marijuana but continued to date him. If Mother genuinely believes her boyfriend laced her marijuana, she has not changed the circumstances that allowed him to do so. Mother continues to consume marijuana despite now framing her psychosis as a "bad reaction" to marijuana. Moreover, despite her multiple DUI convictions, Mother admits to continued consumption of alcohol.

Mother's explanations and seemingly sincere beliefs often conflict with other evidence, including but not limited to the state of her health insurance, whether and where she is eligible to receive treatment, whether providers have supplied referrals, her relationship with the maternal grandparents, whether the maternal grandparents are a threat to Child, whether she spent time in the hospital due to psychosis, and the circumstances under which her former coworker took her to the sheriff's office. While Mother describes the March 2023 psychotic episode as a one-time mental health crisis, it is evident

Mother has struggled for years with her mental health and has consistently resisted and refused treatment. Her family described her adolescent struggles, Navy physicians diagnosed her with PTSD, and she sought treatment for both anxiety and depression. However, when her anxiety and depression began to improve, she ceased her medication protocol. Then, she attempted suicide.

Mother points to the maternal grandmother's statement and former coworker's statement as evidence that she is unlikely to experience further mental health crises. While the maternal grandmother stated the psychosis was "abnormal" for Mother, she elaborated that Mother dealt with both anxiety and depression before. The maternal grandmother also described a time when Mother lied to police in Pennsylvania about being unhoused and abandoned and consequently ended up in the Pennsylvania foster care system for a period of four months. While the former coworker did not anticipate another psychotic episode, he only interacted with Mother a couple of times a year and believed her to be "on top of her personal life." The coworker had no plans to speak with Mother after her psychotic episode.

Mother compares her case to *In re J.N., supra*, 181 Cal.App.4th 1010, in which three children were injured when their drunken father crashed the family car. (*Id.* at pp. 1014-1015.) There, the court found there was no evidence to support an inference that such behavior would recur. (*Id.* at p. 1026.) She asks that we follow the same logic in her case. We distinguish Mother's case because her dangerous substance misuse *has* recurred, as evidenced by her multiple DUIs. Further, her mental health incidents appear recurrent, as evidenced by her suicide attempt, this psychotic episode, and Mother's admission to healthcare providers that she did not believe she would live to her next birthday.

11

While it may be true that Child was not present for the DUIs, suicide attempt, or domestic violence incidents, Child *was* present during Mother's psychotic episode. Multiple disinterested parties were concerned for Child's safety. They feared Mother, behaving erratically, would drop Child while she evaded deputies. While Mother stated she " 'genuinely did not mean to put [Child] in danger,' " the fact remains that she *did* put Child in danger. This was not a mere hypothetical scenario in which Mother *might* abuse or neglect Child. It is evident, throughout the record and in the briefings, that Mother believed she and Child were in danger from "someone." However, Mother's inability to distinguish reality from her paranoia is precisely what led her to put Child in danger. Mother has no formal diagnosis and, consequently, no targeted treatment plan. Given her continued consumption of the marijuana she blames for the incident, continued exposure to the man she blames for the marijuana, and her repeated denials that she requires treatment, the juvenile court had substantial evidence to conclude that Child was at substantial risk of harm in Mother's care.

Turning to the issue of removal, Mother argues that she is not a current risk to Child and that removal is not necessary. However, it is evident from the record before us that Mother has done nothing to change the circumstances which necessitated dependency. The facts discussed above coupled with the social worker's opinion constitute substantial evidence that there is or would be substantial danger to Child's physical health, safety, and protection, or physical or emotional well-being if returned to Mother, and that there are no reasonable means to protect Child without removal. We conclude that this history, reviewed in its entirety, provides substantial evidence to support the juvenile court assuming jurisdiction and ordering removal of Child.

12

## DISPOSITION

The juvenile court's orders are affirmed.


                                        O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

CASTILLO, J.